UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| TIMOTHY L. BLIXSETH,<br><br>　　　　Plaintiff,<br><br>v.<br><br>BRIAN GLASSER, AS TRUSTEE OF THE YELLOWSTONE LIQUIDATING TRUST,<br><br>　　　　Defendant.<br><br>(Original Case) | Case No. 2:13-cv-01434-APG-GWF<br>(Consolidated with 2:13-cv-01737-APG-GWF; 2:13-ms-102)<br><br>**ORDER DENYING BLIXSETH'S MOTIONS FOR SUMMARY JUDGMENT AND TO QUASH and DENYING YELLOWSTONE'S MOTION FOR SUMMARY JUDGMENT** |
| BRIAN GLASSER, AS TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST,<br><br>　　　　Plaintiff,<br><br>v.<br><br>TIMOTHY L. BLIXSETH,<br><br>　　　　Defendant.<br><br>(Consolidated case) | |

　　　　Currently before me are motions for summary judgment filed by Timothy Blixseth ("Blixseth") (Dkt. #34 in Original Case, later renewed by Dkt. #52), and by Brian Glasser in his capacity as Trustee of the Yellowstone Club Liquidating Trust ("YCLT") (Dkt. #4 in consolidated case no. 2:13-cv-1737 ("Second Action")). Resolution of the motions primarily turns on whether the Montana Bankruptcy Court had the power to enter its December 5, 2012 final order entering damages in the amount of $40,992,210.81 against Blixseth in the adversary

proceeding *Blixseth v. Kirschner (In re Yellowstone Mountain Club, LLC)*, Adv. Dkt. 09-00014[1] (Bankr. D.Mont.) ("Montana Action"). Because Blixseth consented to having the Montana Bankruptcy Court hear and enter a final judgment on the related claims, that judgment was validly entered and registered in this District, and may be enforced here.

## I.   FACTUAL AND PROCEDURAL HISTORY

This case has a tortured procedural history, which is only briefly summarized below. I take judicial notice[3] of the proceedings before the Montana Bankruptcy Court and related appeals.

### A.   The Montana Action

Blixseth became a party to the Yellowstone Mountain Club, LLC bankruptcy proceedings in Montana when he filed two proofs of claim against the estate totaling $276,000 (BK Dkt. #1413 at 2).[4] He later filed a complaint in intervention in the Montana Action. Blixseth sought a declaration that a loan transaction from which he received a distribution was not a fraudulent transfer under Montana law. (Adv. Dkt. #38 at 11.) In response, the unsecured creditors committee ("UCC") brought state law counterclaims seeking to avoid a distribution to Blixseth as a fraudulent transfer. (Adv. Dkt. ##98, 236.)

On August 16, 2010, the Montana Bankruptcy Court entered an interim order in *In re Yellowstone Mountain Club, LLC*, 436 B.R. 598 (Bankr. D. Mont. 2010) *amended on reconsideration in part*, 08-61570-11, 2010 WL 3504210 (Bankr. D. Mont. Sept. 7, 2010) *amended*, 08-61570-11, 2012 WL 6043282 (Bankr. D. Mont. Dec. 5, 2012) *aff'd*, CV-12-83-BU-

---

[1] All references to "Adv. Dkt. #" are to the document number in the Montana bankruptcy adversary case.

[3] Under Fed. R. Evid. 201(b)-(d), I may take judicial notice of facts that can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned, and may do so at any stage of the proceeding. Court records in another proceeding are properly the subject of such notice. *United States v. Howard*, 381 F.3d 873, 876 n.1 (9th Cir. 2004).

[4] References to "BK Dkt. #" refer to the document number in the bankruptcy case of *In re Yellowstone Club, LLC*, 08-61570-RBK.

SEH, 2014 WL 1369363 (D. Mont. Apr. 7, 2014). That order determined that, among other things, the distribution Blixseth received from certain loan proceeds was a fraudulent transfer. On August 1, 2011, in another adversary proceeding under the main bankruptcy case, the Montana Bankruptcy Court considered whether, in light of the Supreme Court's then-recent holding in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), it had jurisdiction to hear and unilaterally determine the fraudulent transfer claims asserted by plaintiff Samson. *Samson v. Blixseth (In re Yellowstone, LLC)*, 2011 WL 3274042 (Bankr. D. Mont. Aug. 1, 2011), *order amended on denial of reconsideration*, 463 B.R. 896 (Bankr. D. Mont. 2012). The bankruptcy court initially concluded that *Stern* barred non-Article III courts from deciding such matters. But on January 3, 2012, the bankruptcy court amended its holding and concluded that it did have jurisdiction to hear and determine such matters. 463 B.R. at 907.

On October 12, 2011, Blixseth filed a motion to dismiss for lack of subject matter jurisdiction in light of *Stern* and the then-pending Ninth Circuit case of *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553 (9th Cir. 2012) *cert. granted*, 133 S. Ct. 2880, 186 L. Ed. 2d 908 (U.S. 2013) *and aff'd sub nom. Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (2014). (Adv. Dkt. #659.) On December 13, 2011, the bankruptcy court ruled that it could properly exercise jurisdiction. (Adv. Dkt. #682 at 5.) Nearly one year later, the bankruptcy court entered its final judgment, awarding YCLT $40,992,210.81 against Blixseth. *In re Yellowstone Mountain Club, LLC*, 09-00014, 2012 WL 6043282 (Bankr. D. Mont. Dec. 5, 2012). The bankruptcy court emphasized that "*Bellingham* agreed with the Supreme Court's decision in *Stern* that parties can impliedly consent to a bankruptcy court's jurisdiction." *Id*. at *7 (citing 702 F.3d at 569-70). Accordingly, the court concluded that "Blixseth's course of conduct, through his affirmative actions from March 16, 2009, when he sought to intervene, until September 7, 2010, when this Court entered its Amended Judgment, constitutes an implied consent by Blixseth to this Court's

jurisdiction." *Id.*

Both YCLT and Blixseth appealed to the United States District Court for the District of Montana. *Blixseth v. Glasser (In re Yellowstone Club LLC)*, 2:12-cv-00083-SHE. On April 7, 2014, that court affirmed the bankruptcy court, holding that "[Blixseth] agreed to the bankruptcy court's jurisdiction and fully participated in the proceedings through entry of final judgment, those actions constituted implied or informal consent to [the bankruptcy court's] authority to render a final decision. . . ." *Id.,* Dkt. #54 at 6 n.11. The parties filed cross-appeals which are pending before the Ninth Circuit. *Id.,* Dkt. ##55, 57; *see also* Ninth Circuit Court of Appeals Case No. 14-35438.

**B.    Blixseth's Involuntary Bankruptcy**

Meanwhile, on April 5, 2011, the Montana Department of Revenue, Idaho State Tax Commission, and California Franchise Tax Board filed an Involuntary Chapter 7 Bankruptcy Petition against Blixseth in the United States Bankruptcy Court for the District of Nevada. *See In re Blixseth*, Case No.: 11-15010-WTT. Soon thereafter, Idaho and California withdrew. The Nevada Bankruptcy Court dismissed the involuntary case, but the Bankruptcy Appeals Panel for Ninth Circuit reversed. Upon remand, YCLT filed a joinder to the involuntary petition against Blixseth. On July 10, 2013, the Nevada Bankruptcy Court again dismissed the involuntary case. Subsequently, Blixseth filed a motion with the Nevada Bankruptcy Court seeking an award against Montana and YCLT for his attorney's fees and costs under 11 U.S.C. § 303(i)(1). (Dkt.#17, Exhibit "C".)

**C.    YCLT's Registration Actions**

On July 19, 2013, YCLT commenced this action ("Main Action") by filing a request to register the Montana Judgment in this Court. (Dkt.#1.) I granted that request, and subsequently entered Orders granting YCLT's application to charge any partnership interest that Blixseth holds

4

in various entities. (Dkt.##9, 12.)

On August 20, 2013, a Writ of Execution ("First Writ") was issued against Blixseth in favor of YCLT. (Dkt.#13.) Under the Writ, YCLT sought to attach "[a]ll rights, titles, and interests in all choses in action arising under, arising in and related to U.S. Bankruptcy Court District of Nevada, *In re: Timothy L. Blixseth*, Case No. 11-15010-WTT…, including … damages … under 11 U.S.C. § 303(i). . . ."[5] (Dkt.#13 at 15.) The Writ also directed a sale of that property on September 10, 2013. (*Id*. at 16.)

On August 23, 2013, Blixseth filed an Emergency Motion to Quash the Writ of Execution. (Dkt. #17.) During the hearing on that Emergency Motion, Blixseth questioned whether YCLT properly registered the Montana Judgment under 28 U.S.C. § 1963 ("Registration Statute"). (Tr. of Hr'g (September 5, 2013), Dkt.#31 at 7:21-8:3.) After supplemental briefing and oral arguments, I stayed both the sale that was the subject of the Writ, and the Nevada bankruptcy proceedings as to YCLT. (*Id*. at 21:13-15.) On September 23, 2013, both Parties filed Cross-Motions for Summary Judgment. (Dkt.#4 in the Second Action and Dkt.#34 in the Main Action).

YCLT commenced the Second Action on September 23, 2013. (Dkt. #1 in Case No. 2:13-cv-1737.) YCLT filed both a Complaint and its Motion for Summary Judgment on the same date, essentially seeking a new "judgment upon judgment" (that is, a judgment in this Court based upon the judgment entered in the Montana Bankruptcy Court), as an alternative remedy to registering its judgment under 28 U.S.C. § 1963. That Second Action was consolidated into the Main Action on September 24, 2013. (Dkt. #38 in Main Action.)

On December 16, 2013, I denied without prejudice both the YCLT and Blixseth Motions

---

[5] Section 303(i)(1) provides that "[i]f the court dismisses [an involuntary] petition…other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment [] against the petitioners and in favor of the debtor for [costs and attorney's fees]."

5

for Summary Judgments. (Dkt. #46 in the Main Action.) I also (1) lifted the stay of the bankruptcy proceedings as to YCLT, (2) quashed YCLT's Writ, and (3) dismissed without prejudice the Main and Second Actions. (*Id.* at 8.) I found that YCLT had not received from the Montana Bankruptcy Court a certification for registration of the Montana Judgment as required under 29 U.S.C. § 1963. (*Id.* at 7-8.) Because an appeal from the Montana Judgment was pending, and because YCLT had failed to properly register that judgment in this district, this Court lacked jurisdiction over the case. (*Id.* at 7.)

On December 17, 2013, YCLT sought relief from my Order under FRCP 60(b), asserting that the judgment it sought in the Second Action was an alternative remedy to registering a judgment under 28 U.S.C. § 1963, and thus was unaffected by whether the Montana Judgment was properly registered in this district. (Dkt. #47 at 4 in the Main Action.)  YCLT also informed this Court that on December 4, 2013, the Montana Bankruptcy Court had issued an order authorizing YCLT to register its action in this district. (*Id.* at 5-6.) On December 19, 2013, I granted YCLT relief to the extent that it sought to pursue its judgment in the Second Action, but required YCLT to bring a new action seeking to register the Montana Judgment. (Dkt. #48.)

On December 19, 2013, YCLT filed a third action registering the Montana Judgment in Case No. 2:13-ms-102 ("Third Action"), which was consolidated into the Main Action. (Dkt. #51.) YCLT included the Montana Bankruptcy Court's order certifying the Montana Judgment for registration in this District.  On January 2, 2014, the clerk of court issued another Writ of Execution ("Second Writ"). (Dkt. #6 in Case No. 2:13-ms-102.) Unlike the First Writ, which specifically sought to sell Blixseth's 303(i) action, the Second Writ does not include any mention of the 303(i) action or Blixseth's underlying involuntary bankruptcy case.

On March 26, 2014, the United States moved to intervene in the Main Case, asserting a tax lien in the amount of $4,772,490.27, plus other statutory additions accruing after March 19,

2014. (Dkt. #57 at 2.) That motion was granted. (Dkt. #61.)

Blixseth's pending motions for summary judgment (Dkt. ##34, 52) seek to block YCLT's attempt to levy upon his 303(i) rights. YCLT's pending motion (Dkt. #4 in consolidated case no. 2:13-cv-1737) seeks entry of a judgment from this Court based upon the Montana Judgment.

## II.     DISCUSSION

### A.     The Montana Bankruptcy Court had the power to enter a final judgment, and therefore had the power to certify that judgment for registration in this District.

Blixseth challenges whether the Montana Bankruptcy Court had the authority to render a final judgment in light of *Stern v. Marshall*, 131 S. Ct. 2594, 180 (2011) and *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553 (9th Cir. 2012) *cert. granted*, 133 S. Ct. 2880, 186 L. Ed. 2d 908 (U.S. 2013) *and aff'd sub nom. Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (2014). (Dkt. #52 at 5 n.1.) If the Montana Bankruptcy Court lacked the power to enter a final judgment, then its certification of that judgment for registration in this District would be void.

In *Stern*, the Supreme Court considered whether Congress could, through 28 U.S.C. § 157, constitutionally allocate the authority to enter final judgments between the bankruptcy court and the district court. 131 S.Ct at 2607. Section 157(b) provides a non-exhaustive list of "core proceedings" that bankruptcy courts may hear and determine, including "(C) counterclaims by the estate against persons filing claims against the estate" and "(H) proceedings to determine, avoid, or recover fraudulent conveyances." The Court held that Article III of the United States Constitution prohibits Congress from vesting a bankruptcy court with the authority to finally adjudicate claims where what is involved is:

> the most prototypical exercise of judicial power: the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime. If such an exercise of judicial power may nonetheless be taken from the Article III Judiciary simply by deeming it part of some amorphous "public right," then Article III would be transformed from the guardian of individual liberty and separation of powers we have long recognized into mere wishful thinking.

*Id.* at 2615 (emphasis in original).  Accordingly, the Court concluded that the bankruptcy court could not enter a final judgment on a state-law claim for tortious interference with a gift expectancy because it would constitute an impermissible exercise of judicial power reserved to the Article III courts. *Id.* at 2611.  In bankruptcy nomenclature, this has come to be known as a "*Stern* claim": "a claim designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter." *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (U.S. 2014).

In *Bellingham*, the Ninth Circuit examined whether fraudulent conveyance proceedings under section 157(b)(2)(H) are *Stern* claims, and if so, whether a bankruptcy court could nevertheless enter a final judgment in such a proceeding with the parties' consent. 702 F.3d at 565-67.  The court answered these questions in the affirmative, and held that consent need not be express, but could be implied. *Id. See also Mastro v. Rigby*, 13-35209 at 8 (9th Cir. Aug. 22, 2014).

The *Bellingham* fraudulent conveyance action arose when the Chapter 7 trustee, Arkison, filed a complaint against EBIA, an entity to which the debtor transferred $373,291.28 on the eve of the debtor's bankruptcy. *Id.* at 556-57.  Among other things, Arkison sought to avoid the transaction as a fraudulent transfer pursuant to the bankruptcy court's core proceedings power under section 157(b)(2)(H). EBIA initially demanded a jury trial, invoking its rights under *Granfinanciera, S.A. v. Nordberg*,[7] which the bankruptcy court treated as a motion to withdraw the reference. 702 F.3d at 568.  Instead of pursuing a hearing on the withdrawal motion before the district court, EBIA requested that the district court stay its consideration of the motion to withdraw the reference until the bankruptcy court decided Arkison's motion for summary

---

[7] 492 U.S. 33 (1989) (holding that held that a fraudulent conveyance claim under Title 11 is not a matter of "public right" for purposes of Article III, 492 U.S., at 55, and that the defendant to such a claim is entitled to a jury trial under the Seventh Amendment, *id.*, at 64, 109 S.Ct. 2782).

judgment. *Id.* The bankruptcy court granted summary judgment in favor of Arkison, concluding that the transaction was indeed a fraudulent transfer, and entered final judgment for $373,291.28. *Id.* at 557. EBIA appealed to the district court, again failing to object to the bankruptcy court's authority to enter final judgment, and the district court affirmed. *Id.*

EBIA appealed to the Ninth Circuit, failing yet again to raise the issue of the bankruptcy court's authority to enter final judgment. *Id.* at 568. Just prior to oral argument, EBIA filed a motion to dismiss on precisely that basis. *Id.* at 557. Nevertheless, the court reached the issue and held that despite Congress's designation of fraudulent conveyance[8] actions as core proceedings, bankruptcy courts do not have the unilateral authority to hear and finally determine such claims. *Id.* at 565-66. The court, however, held that notwithstanding this lack of authority, parties may consent to a bankruptcy court finally determining a fraudulent conveyance claim. *Id.* at 567. The court further held that such consent could be implied by the parties' actions. *Id.*

The court concluded that EBIA had impliedly consented. "Because EBIA waited so long to object, and in light of its litigation tactics, we have little difficulty concluding that EBIA impliedly consented to the bankruptcy court's jurisdiction." *Id.* at 568. The court rejected the argument that EBIA could not have known of its right to object under *Stern* because it had not yet been decided.

> EBIA had ample reason to be alert to the possible jurisdictional problem. We published *Marshall v. Stern*, 600 F.3d 1037 (9th Cir. 2010), on March 19, 2010, before EBIA asked the district court to stay its motion to withdraw the reference. . . . Although we reached a different set of conclusions than the Supreme Court ultimately did, the opinion should have been sufficient to alert EBIA to the possible jurisdictional problem.

. . . .

---

[8] As the Bankruptcy Appeals Panel for the Ninth Circuit noted in *In re Pringle*, 495 B.R. 447, 454 n.6: "Section 157(b)(2)(H) designates proceedings to recover 'fraudulent *conveyances*' as core matters. This reference undoubtedly includes [11 U.S.C. §§ 544 and] 548 fraudulent *transfers*." (emphasis in original.)

9

> Although EBIA may not be as sophisticated or creative as [the claimant in *Stern*], it fully litigated the fraudulent conveyance action before the bankruptcy court and the district court, without so much as a peep about Article III—even going so far as to abandon its motion to withdraw the reference. The consequences of a litigant sandbagging the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor—can be severe. Having lost before the bankruptcy court, EBIA cannot assert a right it never thought to pursue when it still believed it might win.

*Id.* at 569 (internal citations and quotations omitted). On June 9, 2014, the Supreme Court affirmed *Bellingham* in *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (2014).

While *Bellingham* was pending before the Supreme Court, the Bankruptcy Appeals Panel ("BAP") for the Ninth Circuit analyzed *Bellingham's* concept of implied consent to determine whether it required "waiver—the intentional relinquishment of a known right—or whether the required consent can be supplied through forfeiture." *Hasse v. Rainsdon (In re Pringle)*, 495 B.R. 447, 460 (B.A.P. 9th Cir. 2013). The BAP noted that while "the two doctrines are similar, the distinction between them is well-known: 'Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

In *Pringle*, the debtor transferred his residence to Hasse by a gift deed. *Id.* at 452. Pringle later filed bankruptcy, disclosing the transfer on his bankruptcy schedules. *Id.* The bankruptcy trustee brought an adversary proceeding against Hasse to recover the transfer of the residence as a fraudulent transfer. *Id.* Following trial, the bankruptcy court entered judgment in favor of the trustee, avoiding the transfer. *Id.* at 455.

On appeal, the BAP raised the question whether the bankruptcy court had the power to enter a final order on the fraudulent transfer claim. *Id.* at 459. The BAP compared Hasse's actions to those of EBIA in *Bellingham*.

> Hasse was not calculating; she and her counsel were clueless. . . . The record is devoid of facts that indicate "sandbagging" or manipulation of the litigation process. The record, however, is replete with instances of Hasse's conscious engagement and use of the bankruptcy court and the services of this Panel to resolve the Trustee's claim in her favor. More importantly, these actions were undertaken against an almost unavoidable backdrop which called the bankruptcy court's authority into question. As stated previously, despite the background rumblings of *Marshall v. Stern (In re Marshall)*, 600 F.3d 1037 (9th Cir. 2010) at the Ninth Circuit and *Stern v. Marshall* at the Supreme Court, Hasse stood mute while the bankruptcy court and this Panel endeavored to resolve the dispute.

*Id.* The BAP concluded that even this level of inaction was sufficient to constitute a waiver, and thus Hasse's implied consent.

> [O]nce a party is alerted, or is held to be alerted, to the potential risks of failing to raise the issue of the tribunal's authority, there is a rebuttable presumption that such failure to act was intentional, and that further purposeful proceeding in the forum indicates consent. If applicable, this presumption then shifts the burden to the objecting party to show a lack of consent, a burden that requires more than a simple statement after litigation has been completed that consent had never been fully given.

*Id.* at 461. The BAP held that Hasse's conduct constituted implied consent to the bankruptcy court's authority to hear and finally determine the case. "To allow her to now challenge the court's authority to enter a final order on the basis of lack of consent would be to ignore *Bellingham's* equating such participation with the voluntary acceptance of the bankruptcy court's ability to determine the matter and enter a final judgment." *Id.* at 462.

In the case before me, Blixseth filed his complaint in intervention in the Montana Bankruptcy Court on March 24, 2009, almost one year before the Ninth Circuit issued its March 19, 2010 decision in *Marshall v. Stern*. Blixseth argues that

> [YCLT's] fraudulent transfer claims against Mr. Blixseth in 2009 were all "core" claims under 28 U.S.C. § 157(b)(2) for which Mr. Blixseth had no basis to object to entry of a final judgment until the Supreme Court issued its *Stern* opinion in June of 2011. It is fundamental to all notions of due process that Mr. Blixseth cannot

11

have impliedly waived a constitutional right he did not know he had prior to *Stern v. Marshall*.

(Dkt. #17 at 11 n.3.) However, the bankruptcy court issued its interim order on August 16, 2010 (five months after the Ninth Circuit's *Marshall v. Stern* decision), and amended that order on September 7, 2010. Under the holding in *Bellingham*, Blixseth was on notice of the potential risks of failing to question the bankruptcy court's authority, but did not challenge on that basis until October 12, 2011. Thus, *Bellingham* rejects Blixseth's argument. The Supreme Court affirmed *Bellingham* in *Arkison* without reaching the question of consent; therefore, *Bellingham* remains good law in this circuit. *Mastro v. Rigby*, 13-35209 at 8 (9th Cir. Aug. 22, 2014).

Under *Pringle*, Blixseth's failure to act once he was alerted to the potential risks of failing to question the bankruptcy court's authority gave rise to the rebuttable presumption that his failure to act was intentional. Blixseth continued to actively litigate the matter until October 12, 2011, when he finally challenged the bankruptcy court's authority in light of *Stern v. Marshall*. But this was well over a year after the Ninth Circuit issued its decision in *Marshall v. Stern*.[9] To allow Blixseth "to now challenge the [bankruptcy] court's authority to enter final judgment on the basis of lack of consent would be to ignore *Bellingham's* equating such participation with the voluntary acceptance of the bankruptcy court's ability to determine the matter and enter final judgment." 495 B.R. at 462.

Accordingly, I hold that Blixseth consented to having the Montana Bankruptcy Court hear and enter a final judgment. Therefore, that court's certification of its judgment for registration in this District is valid. I thus deny Blixseth's Motion to Quash.

**B.   Blixseth's Motion for Summary Judgment (Main Action, Dkt. #52) is otherwise unripe.**

As discussed above, Blixseth filed two Motions for Summary Judgment seeking to

---

[9] Moreover, like EBIS and Hasse, Blixseth was represented by able counsel.

preclude YCLT from levying on his 303(i) claim. (Dkt. ##34, 52.) However, the Second Writ (Dkt. #6 in Case No. 2:13-ms-102) does not seek execution on Blixseth's 303(i) action. Thus, any ruling on Blixseth's motion would constitute little more than an improper advisory opinion.

As aptly stated in *Westlands Water Dist. Distribution Dist. v. Natural Res. Def. Council, Inc.*, 276 F. Supp. 2d 1046, 1050 (E.D. Cal. 2003):

> The prohibition on advisory opinions, first announced in *Hayburn's Case*, 2 U.S. 408, 2 Dall. 409, 1 L.Ed. 436 (1792), is now a well-settled feature of Article III jurisprudence. *See Clinton v. Jones*, 520 U.S. 681, 700 n. 33, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) ("This Court early and wisely determined that it would not give advisory opinions even when asked by the Chief Executive.") (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948)). Regardless of whether the relief sought is monetary, injunctive or declaratory, in order for a case to be more than a request for an advisory opinion, there must be an actual dispute between adverse litigants and a substantial likelihood that a favorable federal court decision will have some effect. *See Calderon v. Ashmus*, 523 U.S. 740, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998); *Plaut v. Spendthrift Farm*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995).

Blixseth's motion attacks a hypothetical rather than actual legal dispute concerning whether his 303(i) claim is a chose in action subject to execution. (Dkt. #52 at 10-17.) While the Second Writ does instruct execution on Blixseth's choses in action, it does not identify his 303(i) claim as such a chose in action; indeed, it makes no reference to that claim whatsoever. (Dkt. #6 in Case No. 2:13-ms-102.) I decline to issue an opinion on a dispute that may never arise.

Because Blixseth's earlier-filed Motion for Summary Judgment (Dkt. #34) is essentially subsumed in his renewed Motion for Summary Judgment (Dkt. #52), I deny the first motion (Dkt. 34) as moot. I deny the second motion (Dkt. #52) without prejudice as unripe. Should YCLT seek to execute on Blixseth's 303(i) claim, Blixseth may seek appropriate relief at that time.

C.  **YCLT's pending Motion for Summary Judgment**

As an alternative to registering its judgment in this District, YCLT filed the Third Action

13

seeking a judgment on the Montana Judgment. (Dkt. #1 in 2:13-cv-1737.) YCLT now moves for summary judgment against Blixseth for $40,992,210.81. (Dkt. #4 in 2:13-cv-1737.) However, because I am affirming the validity of YCLT's registration of the Montana Judgment, there is no need for YCLT to obtain a judgment on that judgment. Thus, YCLT's Motion for Summary Judgment is denied as moot.

### III.   CONCLUSION

For the foregoing reasons, YCLT's Motion for Summary Judgment (Dkt.#4 in 2:13-cv-01737) and Blixseth's first Motion for Summary Judgment (Dkt.#34 in 2:13-cv-01434) are **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that Blixseth's second Motion for Summary Judgment or to Quash Writ of Execution (Dkt. #52 in 2:13-cv-1434) is **DENIED WITH PREJUDICE** to the extent it seeks to invalidate YCLT's registration of the Montana Judgment in this District, or any actions resulting therefrom. The Motion is **DENIED WITHOUT PREJUDICE AS UNRIPE** to the extent it seeks to resolve whether Blixseth's rights under Bankruptcy code section 303(i) are subject to YCLT's Writ.

DATED this 25th day of August, 2014.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE